**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RX SOLUTIONS, INC.** | § | **PLAINTIFF** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:23cv100-HSO-MTP** |
| | § | |
| | § | |
| **CAREMARK, L.L.C., and** | § | |
| **CVS PHARMACY, INC.** | § | **DEFENDANTS** |

<u>**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART WITHOUT PREJUDICE DEFENDANTS
CAREMARK, L.L.C., AND CVS PHARMACY, INC.'S MOTION [53]
TO DISMISS, AND DECLINING TO EXERCISE SUPPLEMENTAL
JURISDICTION OVER STATE-LAW CLAIMS**</u>

Defendants Caremark, L.L.C., and CVS Pharmacy, Inc. seek dismissal under Federal Rule of Civil Procedure 12(b)(6) of Plaintiff Rx Solutions, Inc.'s state and federal claims related to the purported denial of Plaintiff's request to enter Defendants' pharmacy benefit management ("PBM") network. The Court finds that Defendants' Motion [53] to Dismiss should be granted in part, as to Plaintiff Rx Solutions, Inc.'s claims under the Sherman Act, and these claims will be dismissed with prejudice. The Motion [53] should be denied in part without prejudice, in that the Court will decline to exercise supplemental jurisdiction over the state-law claims and will dismiss them without prejudice. *See* 28 U.S.C. § 1367(c)(3).

## I.  BACKGROUND

A.    Factual background

Plaintiff Rx Solutions, Inc. ("Plaintiff" or "Rx Solutions") is a retail pharmacy located in Harrison County, Mississippi, "with its principal place of business being 11545 Old Highway 49, Gulfport, Mississippi," Am. Compl. [52] at 1, which also serves the "Geene [sic] County, Mississippi, and Stone County, Mississippi, markets," *id.* at 6.  According to the Amended Complaint [52], Rx Solutions is "owned and controlled by Logan Cain (50% ownership) and Evan Cain (50% ownership)" and operated by Louis Lee Bond, who is a "CPA and former CEO of Singing River Health System, a multi-hospital system located in Jackson and Harrison Counties."  *Id.* at 3.  The pharmacist in charge is Heather Smith.  *Id.*

According to the Amended Complaint [52], Defendant Caremark, L.L.C. ("Caremark") manages prescription benefits for individuals and is "the owner of the largest – or one of the largest – pharmacy benefit management (PBM) networks in the United States."  *Id.* at 2.  In order for individuals to receive network benefits from a retail pharmacy, that retail pharmacy must be a member of the Caremark network.  *Id.*  Defendant CVS Pharmacy, Inc. ("CVS") is "the largest – or one of the largest – retail pharmacies in the United States."  *Id.*  Through the use of a PBM network, CVS and Caremark (collectively, "Defendants") allegedly "colluded and conspired to provide an improper, unfair advantage to themselves regarding the market price set for prescription medications in the State of Mississippi, including but not limited to the Greene County, Mississippi and Stone County, Mississippi

markets." *Id.* Rx Solutions alleges that, although pharmacies such as it were properly qualified for admission, they were not allowed to participate in Caremark's PBM network so Defendants could improperly control the market price of prescription medications in the State of Mississippi. *Id.* at 2, 4.

Rx Solutions contends that Defendants' collusion worked to its and the public's detriment through several strategies, including artificially controlling the pricing of prescription medication, improperly controlling whom Defendants allowed into their PBM network, maintaining a limited network of retail pharmacies, owning several mail-order pharmacies, establishing exclusive contracts with many health plans and employers, and negotiating volume-based rebates with pharmaceutical manufacturers. *Id.* at 7-8. These strategies purportedly "resulted in an improper increase of market power and reduced competition, which allows [Defendants] to improperly dominate the prescription medication market." *Id.* at 8.

Rx Solutions asserts that it is qualified for admission into Caremark's PBM network and properly completed a Pharmacy Provider Pre-Credentialing Questionnaire and Application, but Defendants arbitrarily and improperly denied its enrollment in order to control the market price of prescription medications in Mississippi, including but not limited to the markets in Greene and Stone Counties, Mississippi. *Id.* at 4. Specifically, on November 16, 2022, Defendants denied Rx Solutions' enrollment because it purportedly provided "incomplete, inconsistent and/or inaccurate information regarding Rx Solutions ownership," on grounds that it listed its owners as Logan and Evan Cain on the pre-enrollment questionnaire

and enrollment application, but they were not listed on the company's Mississippi corporate documents. *Id.* Instead, the Mississippi corporate documents identified Gina Bardwell Tompkins ("Ms. Tompkins"), but she was not disclosed on the questionnaire and application. *Id.*

The Amended Complaint [52] alleges that Rx Solutions informed Defendants on January 17, 2023, that Caremark had made factual errors in its determination because Rx Solutions had previously disclosed that Logan and Evan Cain are each 50% owners, and that Ms. Tompkins was merely the incorporator and registered agent. *Id.* at 4-5. Defendants responded, again denying Rx Solutions' enrollment because the "pharmacy provided incomplete, inconsistent and/or inaccurate information regarding Rx Solutions ownership." *Id.* at 5. Defendants then allegedly made the false claim, for the first time, that

> the owners identified during the application and appeal process have affiliations with both Quest Pharmacy and the previous owner Harold Ted Cain who was found guilty of violating the False Claims Act (31 U.S.C. Section 3729 et. Seq [sic])" ("FCA").

*Id.* Harold Ted Cain ("Ted Cain") is Logan and Evan Cain's father. *Id.* at 6. But Plaintiff asserts that Ted Cain is not the owner of, nor is he affiliated with, Rx Solutions as defined by 42 C.F.R. § 45.101, and that he "has never been convicted of a criminal offense related to his involvement in any program under Medicare, Medicaid or Title XX as set forth in 42 CFR 455.106." *Id.*

Rx Solutions claims that it has provided the same information to eight (8) other PBMs and has been accepted into all of those networks; yet, Defendants have refused it entry into the Caremark PBM network. *Id.* at 9. This has caused Rx

Solutions to fill prescriptions for patients without receiving reimbursement and

"has prevented Rx Solutions from expanding operations into areas of community

need." *Id.* According to the Amended Complaint [52],

> Defendants['] improper acts have deprived consumers served by Rx
> Solutions in the State of Mississippi, including but not limited to the
> Greene County, Mississippi and Stone County, Mississippi, markets, of
> their right to use any pharmacy of their choosing by forming a PBM that
> improperly excluded Rx Solutions, and similarly situated companies, or
> provided economic incentives to consumers for using Defendants'
> pharmacy, a member of Defendants' PBM network, to the detriment of
> both the consumers and Rx Solutions.

*Id.* Rx Solutions maintains that "Defendants conspired and colluded to coerce

prescription drug plans into requiring that all routine maintenance prescriptions be

filled at Defendants' pharmacies in the State of Mississippi, including Greene

County, Mississippi and Stone County, Mississippi, the same geographic area

served by Rx Solutions." *Id.* at 10.

B.    Procedural history

After Rx Solutions filed its initial Complaint [1], *see* Compl. [1], Defendants

filed a Motion [5] to Dismiss under Federal Rule of Civil Procedure 12(b)(6), *see* Mot.

[5]. The Court granted that Motion [5] in part and denied it in part, *see* Order [23]

at 24, and dismissed Rx Solutions' claims against Defendants under the Sherman

Act, 15 U.S.C. §§ 1, 2, and Mississippi Code §§ 83-9-6 and 75-21-3 without prejudice,

*see id.* at 25. Rx Solutions then sought and was granted leave to file an Amended

Complaint [52], which is now the operative pleading. *See* Order [51]; Am. Compl.

[52]. The Amended Complaint [52] advances claims for: (1) violation of Section 1 of

the Sherman Act, 15 U.S.C. § 1; (2) violation of Section 2 of the Sherman Act, 15

U.S.C. § 2; (3) violation of Mississippi Code § 83-9-6; (4) violation of Mississippi Code § 75-21-3; and (5) "tortious interference with business." Am. Compl. [52] at 11-15.

Defendants now renew their Motion [53] to Dismiss. Mot. [53]; Mem. [54]. They argue that Rx Solutions' claim under Section 1 of the Sherman Act is legally deficient because Defendants are "corporate siblings" incapable of conspiring with each other, and that "(i) Plaintiff's proposed product and geographic markets are invalid, and (ii) the amended complaint does not contain any factual allegations explaining how Defendants violated section 1." Mot. [53] at 1. According to Defendants, the Section 2 Sherman Act claim fails for the same reasons and because the Amended Complaint [52] "does not plausibly allege (i) a relevant market, (ii) Defendants' possession of monopoly power, (iii) anticompetitive conduct by Defendants, or (iv) anticompetitive injury." *Id.* Defendants take the position that Mississippi Code § 83-9-6 does not apply to PBMs or pharmacies, and that Rx Solutions fails to state a claim under Mississippi Code § 75-21-3 for the same reasons it fails to state Sherman Act claims. *Id.* at 2. Finally, Defendants maintain that "[i]t is legally impossible for Caremark to be liable for tortious interference for refusing to contract with Plaintiff," and "because CVS has no role in managing Caremark's pharmacy networks, a tortious-interference claim against CVS is not plausible." *Id.*; *see also* Reply [58] at 2-4.

Rx Solutions responds that it appropriately responded to the deficiencies noted by the Court in the original Complaint [1] and that proof supporting the

6

antitrust claims is in Defendants' possession, such that Rx Solutions should have an opportunity to conduct discovery and obtain that proof prior to dismissal.  *See* Resp. [57] at 1-2.  Rx Solutions attaches three exhibits to its Response [57]: (1) Caremark's Objections and Responses to Rx Solutions' Interrogatories [57-1]; (2) Caremark's Objections and Responses to Rx Solutions' Requests for Admission [57-2]; and (3) printouts of press releases and articles [57-3].

In Reply, Defendants contend that the Court should disregard the foregoing exhibits because they fall outside the pleadings, but even if they are considered, Rx Solutions' claims should still be dismissed.  Reply [58] at 3.  As for the request for discovery, "a plaintiff must plead a cognizable antitrust claim before demanding costly and burdensome discovery."  *Id.* at 5.

## II.  DISCUSSION

### A.    Relevant legal authority

To withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Vardeman v. City of Houston*, 55 F.4th 1045, 1050 (5th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Plausibility is not akin to probability, but instead, it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quotation omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "[A] complaint does not need detailed factual allegations, but must prove the

plaintiff's grounds for entitlement to relief—including factual allegations in a complaint that when assumed to be true raise a right to relief above the speculative level." *White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 307 (5th Cir. 2021) (quotation omitted).

With respect to the three exhibits attached to Plaintiff's Response [57], "[o]n a Rule 12(b)(6) motion, a district court generally must limit itself to the contents of the pleadings, including attachments thereto." *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) (quotation omitted). But it "may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims." *Id.* Whether to consider such exhibits is within the discretion of the district court. *See Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020).

No exhibits were attached to the Amended Complaint [52], *see* Am. Compl. [52], and neither Defendant has filed an Answer. In its discretion, the Court will exclude the exhibits attached to Rx Solutions' Response briefs, even if they were arguably referenced in the Amended Complaint [52]. *See* Fed. R. Civ. P. 12(d); *Brackens*, 829 F. App'x at 23; *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 783 (5th Cir. 2007).[1] For this reason, the Court need not treat Defendants' Motion [53] as one for summary judgment, *see* Fed. R. Civ. P.

---

[1] Even if the Court considered the exhibits, the result would not change because they contain no additional factual allegations that would salvage the deficient claims. *See* Fed. R. Civ. P. 12(b)(6); Fed. R. Civ. P. 12(d).

12(d), and to the extent Rx Solutions' argument that discovery is required constitutes a request under Rule 56(d) to defer a ruling pending completion of discovery, the Court need not consider it since the Court is only evaluating the adequacy of the Amended Complaint [52] under Rule 12(b)(6).

B.    Analysis

1.    Plaintiff's Sherman Act claims

Rx Solutions asserts that the denial of its entry into the Caremark network "was part of an illicit agreement between Defendants made to restrain trade," Am. Compl. [52] at 11, and "an attempted illicit monopoly between Defendants to restrain trade and commerce," *id.* at 12.  Defendants argue that Rx Solutions has failed to plead a relevant market, which is fatal to its Sherman Act claims.  *See* Mem. [54] at 1, 6-13.

Section 1 of the Sherman Act prohibits agreements to restrain trade.  *See* 15 U.S.C. § 1; *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014).  In order to demonstrate a violation of Section 1, Rx Solutions must plausibly allege that Defendants "(1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 2457 (2023) (quotation omitted).  Section 2 of the Sherman Act prohibits monopolizing or attempting to monopolize trade, as well as conspiracies to monopolize.  *See* 15 U.S.C. § 2.

9

According to the Fifth Circuit, the first step in the analysis for Rx Solutions'
Sherman Act claims is to determine "the relevant market," *Wampler v. Sw. Bell Tel.
Co.*, 597 F.3d 741, 744 (5th Cir. 2010), which is "the area of effective competition,"
*Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (quotation omitted), and which
typically "is the arena within which significant substitution in consumption or
production occurs," *id.* (quotation omitted); *see also* Resp. [57] at 13-14
(acknowledging that Plaintiff must plead the relevant market for both Section 1 and
Section 2 Sherman Act claims). Without a defined relevant market "there is no way
to measure the defendant's ability to lessen or destroy competition." *Am. Express
Co.*, 585 U.S. at 543 (quotation and alterations omitted).

"A district court can dismiss Sherman Act claims for failure to properly define
the relevant market." *New Orleans Ass'n of Cemetery Tour Guides & Companies v.
New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1037 (5th Cir. 2023); *see also
Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 628 (5th Cir. 2002)
("Whether a relevant market has been identified is usually a question of fact;
however, in some circumstances, the issue may be determined as a matter of law.").
Dismissal at the Rule 12(b)(6) stage may also be appropriate for failing to plead a
relevant market if the definition is legally insufficient as a matter of law. *See Apani
Sw., Inc.*, 300 F.3d at 628.

> Where the plaintiff fails to define its proposed relevant market with
> reference to the rule of reasonable interchangeability and cross-
> elasticity of demand, or alleges a proposed relevant market that clearly
> does not encompass all interchangeable substitute products even when
> all factual inferences are granted in plaintiff's favor, the relevant
> market is legally insufficient, and a motion to dismiss may be granted.

*Id.*

The relevant market "is a function of the relevant product market and the relevant geographic market." *Wampler*, 597 F.3d at 744; *see New Orleans Ass'n of Cemetery Tour Guides & Companies*, 56 F.4th at 1036. Therefore, a plaintiff must properly plead two components of the relevant market: (1) the "product market" and (2) the "geographic market." *New Orleans Ass'n of Cemetery Tour Guides & Companies*, 56 F.4th at 1036-37.

a.    <u>Whether the Amended Complaint [52] sufficiently pleads a relevant product market</u>

"A legally cognizable product market must include all commodities reasonably interchangeable by consumers for the same purposes and consider interchangeability and cross-elasticity of demand." *Id.* at 1037 (quotations omitted). If the product market is too limited as pled, and thus defines too narrow of a market, it does not rise to the level of plausibility required to survive a motion to dismiss. *Id.* at 1038.

"Cross-elasticity of demand is the responsiveness of the consumer to price changes among products which are reasonably interchangeable." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 277 n.75 (5th Cir. 1978). "This interchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 380-81 (1956).

For a plaintiff's "definition to be legally sufficient, it must include all commodities reasonably interchangeable by consumers for the same purposes." *Id.* (quotations omitted). "Goods that consumers view as substitutes for other goods can be said to be in competition with each other." *R.D. Imports Ryno Indus., Inc. v. Mazda Distributors (Gulf), Inc.*, 807 F.2d 1222, 1225 (5th Cir. 1987).

The Amended Complaint [52] refers to Defendants' alleged unfair monopolization of the "prescription medication market." Am. Compl. [52] at 11, 12. But this conclusory description of the relevant market that Defendants purportedly seek to monopolize is insufficient because it does not define Plaintiff's proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, which is necessary to plead a legally sufficient product market. *See Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 454 (5th Cir. 2021); *Apani Sw., Inc.,* 300 F.3d at 628; *see also Corrente v. Charles Schwab Corp.*, No. 4:22-CV-00470, 2023 WL 2244680, at *4 (E.D. Tex. Feb. 24, 2023) ("[T]he cases in which dismissal on the pleadings is appropriate typically involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." (collecting cases)). For example, the Amended Complaint [52] does not attempt to plead why the market is limited to the "prescription medication market," Am. Compl. [52] at 11-12, and thus cannot include over-the-counter medications, which in at least some cases may have similar uses and qualities and serve as a reasonable substitute, *see id.*; *see also, e.g.,*

12

*Shah*, 985 F.3d at 454; *Apani Sw., Inc.*, 300 F.3d at 628; *Corrente*, 2023 WL 2244680, at *4. Because the Amended Complaint [52] does not define the product market to consider any interchangeable substitutes or the degree of cross-elasticity of demand between the product and any reasonably interchangeable substitutes, it does not sufficiently define Plaintiff's proposed relevant market, and Defendants' request to dismiss the Sherman Act claims should be granted. *See New Orleans Ass'n of Cemetery Tour Guides & Companies*, 56 F.4th at 1037-38; *Shah*, 985 F.3d at 454; *Apani Sw., Inc.*, 300 F.3d at 628; *Spectrofuge Corp.*, 575 F.2d at 277 n.75.

b.    Whether the Amended Complaint [52] sufficiently pleads the relevant geographic market

*(i)    Relevant legal authority*

In defining the relevant geographic market, a court looks to "the area of effective competition," which is "the area in which the seller operates and to which buyers can practicably turn for supplies." *Wampler*, 597 F.3d at 744 (quotations omitted). The proposed market must also "correspond to the commercial realities of the industry and be economically significant." *Id.* (quotation omitted). "These commercial realities include size, cumbersomeness, and other characteristics of the relevant product along with regulatory constraints impeding the free flow of competing goods into an area, such as perishability of products, and transportation barriers." *Id.* at 744-45 (quotation omitted). To determine the "economic significance" of a proposed market, a court looks to whether the proposed market is "largely segregated from, independent of, or not affected by competition elsewhere." *Id.* at 745 (quotation omitted).

13

"The area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates and to which buyers can practicably turn for supplies." *Apani Sw., Inc.*, 300 F.3d at 626 (quotations omitted).  "Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area."  *Id.* (quotation omitted).

In determining whether a geographic market corresponds to commercial realities, in addition to practical considerations such as the size, cumbersomeness, and other characteristics of the relevant product, "determinants that affect the behavior of market participants may also be considered such as regulatory constraints impeding the free flow of competing goods into the area, perishability of products, and transportation barriers."  *Id.*  "On the other hand, the economic significance of a geographic area does not depend upon singular elements such as population, income, political boundaries, or geographic extent, but rather upon the relationship between these elements and the characteristics of competition in the relevant product market within a particular area."  *Id.* at 626-27 (quotation omitted).  "Put differently, in order for an area to qualify as being economically significant, it must contain an appreciable segment of the product market."  *Id.* at 627 (quotation omitted).

Whether a segment of the product market is appreciable "depends upon whether it includes either an appreciable proportion of the product market as a whole, or a proportion of the product market which is largely segregated from,

independent of, or not affected by competition elsewhere." *Id.* (quotations omitted).

"Therefore, it is not required that an area encompass a large percentage of all

business activity in the relevant product market to be considered economically

significant." *Id.*  An area that contains only a small percentage of business activity

"may qualify as being economically significant if the relevant competition in that

specific area is insulated from equivalent competition elsewhere." *Id.*

*(ii)    Rx Solutions' definition of geographic market*

Rx Solutions states that its principal place of business is in Gulfport,

Mississippi, which is in Harrison County, Am. Compl. [52] at 1,[2] and that CVS's

retail pharmacies "operate in the geographic market of the State of Mississippi,

including but not limited to the Geene [sic] County, Mississippi, and Stone County,

Mississippi, markets, which is the same geographic market area served by Rx

Solutions," *id.* at 6.[3]   The Amended Complaint [52] alleges that, by denying Rx

Solutions admittance into the Caremark PBM network, Defendants have

"prevented Rx Solutions from expanding operations, into areas of community need,

in the State of Mississippi, including but not limited to Greene County, Mississippi

and Stone County, Mississippi." *Id.* at 11; *see also id.* at 12 (same).

---

[2] The Court recognizes that the term "principal place of business" is utilized in determining subject-matter jurisdiction and that, in that context, it "refer[s] to the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010).

[3]  It is unclear why the Amended Complaint [52] focusses on Greene and Stone Counties, two Mississippi counties that do not share any borders.  *See, e.g.,* Mississippi Counties Map, https://www2.census.gov/geo/maps/general_ref/stco_outline/cen2k_pgsz/stco_MS.pdf (last accessed Nov. 5, 2024).

But the Amended Complaint [52] lacks sufficient factual allegations regarding "[t]he area of effective competition in the known line of commerce," including "the market area in which the seller operates and to which buyers can practicably turn for supplies." *Apani Sw., Inc.*, 300 F.3d at 626.  Nor does it plead any factual information concerning the commercial realities of the industry or the market's economic significance.  *See id.*; Am. Compl. [52].  There are no facts pled concerning any practical considerations, such as the size, cumbersomeness, or other characteristics of the relevant product, or any other information concerning the economic significance of the geographic area identified.  *See Apani Sw., Inc.*, 300 F.3d at 626-27.  Nor is there any information explaining how the specific area identified in the Amended Complaint [52] is insulated from equivalent competition elsewhere.  *See id.* at 627.  "[I]dentifying a relevant market requires more than a determination of metes and bounds."  *Id.* at 630 (quotation omitted).  Indeed, metes and bounds of the geographic area are effectively all the Amended Complaint [52] offers, which is insufficient.  *See id.*

Moreover, it is unclear precisely where Rx Solutions operates its retail pharmacy and whether it is attempting to plead that the relevant geographic area is the State of Mississippi, or only two of its counties.  *See* Am. Compl. [52] at 3, 9-10 (alleging Rx Solutions is a retail pharmacy that serves a geographic area "in the State of Mississippi, *including* Greene County, Mississippi and Stone County, Mississippi," but that by denying it entry into the Caremark PBM, "Defendants have prevented Rx Solutions from expanding operations, into areas of community

need, in the State of Mississippi, *including but not limited to* the Greene County, Mississippi and Stone County, Mississippi, markets" (emphasis added)).[4]  Without sufficient information defining the geographic market, the Amended Complaint [52] has not properly alleged the relevant market for purposes of a Sherman Act claim. *See New Orleans Ass'n of Cemetery Tour Guides & Companies*, 56 F.4th at 1037.

The Court is cognizant of some authority holding that, due to the deeply fact-intensive inquiry involved, "dismissal of an antitrust claim for failure to adequately plead the relevant market can be problematic." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011).  But this rule is not absolute, particularly where, as here, there are clear deficiencies at the pleading stage, *see id.*; Am. Compl. [52]; *see also, e.g., Apani Sw., Inc.*, 300 F.3d at 633 (affirming dismissal of federal antitrust claims under Rule 12(b)(6) and "find[ing] that the district court's initial reason for dismissing [the plaintiff's] claim, i.e. the alleged geographic market did not correspond to the commercial realities of the industry and was not economically significant, was proper").  Because the Amended Complaint [52] does not contain sufficient facts to allege a geographic market,

---

[4] Nor did Rx Solutions provide any additional information in opposition to Defendants' current Motion [53] to Dismiss.  *See* Resp. [57] at 15, 16 (merely relying upon the definition of the geographic market in the Amended Complaint [52], stating that in response to the Court's earlier dismissal Order, "Plaintiff set for [sic] a relevant market in its First Amended Complaint," and maintaining that "Plaintiff has stated a relevant geographic market").    The Amended Complaint [52] also mentions that "Defendants own several mail-order pharmacies, which allows them to control the distribution of prescription medications and increase their profit margins, further limiting fair competition and enhancing Defendants' monopoly position."  Am. Compl. [52] at 8.  But no information is alleged regarding the impact of mail-order pharmacies on defining the relevant market.  *See id.*

Defendants' Motion [53] should be granted on this issue. *See New Orleans Ass'n of Cemetery Tour Guides & Companies*, 56 F.4th at 1037.

c.   Whether Defendants engaged in a conspiracy to restrain trade in violation of Section 1 of the Sherman Act

Even if the Amended Complaint [52] adequately pleaded a relevant market, it still does not plausibly allege a violation of Section 1 of the Sherman Act. "To establish a Section 1 violation, a plaintiff must show that the defendant (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *BRFHH Shreveport, LLC*, 49 F.4th at 525 (quotation and alteration omitted). Section 1 requires a conspiracy because the statute "does not prohibit all unreasonable restraints of trade[,] but only restraints effected by a contract, combination, or conspiracy." *Id.* at 526 (quoting *Twombly*, 550 U.S. at 553).

Defendants first argue that, for purposes of Section 1, they "are incapable of conspiring with each another [sic]" because they are "corporate siblings." Mem. [54] at 1; *see id.* at 3-6. Although Rx Solutions did not plead their corporate relationship in the Amended Complaint [52], Defendants argue that the Court can consider publicly-available documents filed with the Securities and Exchange Commission ("SEC"), which show that CVS and Caremark are "sister companies." *Id.* at 5. In response, Plaintiff does not dispute that CVS and Caremark are corporate sisters, but maintains that they are nevertheless capable of conspiring under Section 1. Resp. [57] at 11-12.

The Supreme Court has held that a parent company cannot, as a matter of law, conspire with its wholly-owned subsidiaries because their coordinated activity

must be viewed as that of a single enterprise.  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 770-77 (1984).   And even if other, separate legal entities are involved, given the intra-enterprise conspiracy doctrine, "substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1."  *Id.* at 773 n.21.  Relying upon *Copperweld,* the Fifth Circuit has held that two companies that are wholly-owned subsidiaries of the same parent cannot conspire, because they share a common purpose with the same parent.  *See Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1015 (5th Cir. 1984).

In this case, publicly-available filings show, and Rx Solutions does not dispute, that CVS and Caremark are sister companies, as they are both corporate subsidiaries of CVS Health Corporation.  *See* Mem. [54] at 3-6; Resp. [57] at 11-12; *see also, e.g.*, Ex. 21.1 to CVS Health Corp.'s SEC annual report Form 10-K for the fiscal year ended Dec. 31, 2023, https://www.sec.gov/Archives/edgar/data/ 64803/000006480324000007/exhibit211-2023.htm (last accessed Nov. 6, 2024) (identifying subsidiaries of CVS Health Corporation, including Caremark, L.L.C. and CVS Pharmacy, Inc.); Fed. R. Evid. 201(b)-(c) (permitting the Court to take judicial notice on its own or at a party's request of a fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

The relevant question is whether Defendants "are controlled by a single center of decisionmaking," such that they are in substance a single entity and joint conduct by them "does not deprive the marketplace of independent centers of

decisionmaking," *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 194-95

(2010) (quotation omitted).

> The key is whether the alleged contract, combination, or conspiracy is
> concerted action—that is, whether it joins together separate
> decisionmakers. The relevant inquiry, therefore, is whether there is a
> contract, combination, or conspiracy amongst separate economic actors
> pursuing separate economic interests, such that the agreement deprives
> the marketplace of independent centers of decisionmaking, and
> therefore of diversity of entrepreneurial interests, and thus of actual or
> potential competition.

*Id.* at 195 (citations, quotations, and alterations omitted).

When substantial, independently owned, and independently managed

entities' general corporate actions are guided or determined by separate corporate

consciousnesses and their objectives are not common, they are capable of conspiring

under Section 1. *Id.* at 196. In contrast, two entities' "unitary decisionmaking

quality or the single aggregation of economic power characteristic of independent

action" is indicative of a single enterprise. *Id.*

The Amended Complaint [52] does not assert any facts tending to plausibly

show that the alleged conspiracy between CVS and Caremark joined together two or

more independent centers of decisionmaking. *See id.*; Am. Compl. [52]. It does not

claim the existence of unitary decisionmaking qualities or the single aggregation of

economic power that is characteristic of independent action by either Defendant.

*See Am. Needle, Inc.*, 560 U.S. at 196; Am. Compl. [52]. Nor does Rx Solutions

plead that each Defendant is a substantial, independently owned and independently

managed business whose general corporate actions are guided or determined by

separate corporate consciousnesses, or that their objectives are not common, in

20

order to render them capable of violating Section 1. *See Am. Needle, Inc.*, 560 U.S. at 196-97; Am. Compl. [52].

Without sufficient factual detail tending to show that joint conduct by Defendants deprives the marketplace of independent centers of decisionmaking, the alleged agreement between them cannot constitute a conspiracy under Section 1. *See Am. Needle, Inc.*, 560 U.S. at 194; *see also, e.g.*, *Run it First, LLC v. CVS Pharmacy, Inc.*, No. 21-22604-CIV, 2022 WL 484862, at *1, *6 (S.D. Fla. Feb. 16, 2022) (holding that CVS Pharmacy, Inc. and Caremark PCS Health, LLC were corporate siblings who could not conspire for purposes of Section 1 of the Sherman Act). Defendants' Motion [53] to Dismiss Rx Solutions' Section 1 claims should be granted for this reason as well.

d.    <u>Whether Defendants monopolized, or attempted to monopolize, trade or commerce in violation of Section 2 of the Sherman Act</u>

Defendants contend that, in addition to failing to plead the relevant market, the Amended Complaint [52] does not plausibly allege their possession of monopoly power or anticompetitive conduct, or the existence of anticompetitive injury, mandating dismissal of the Section 2 claim. *See* Mem. [54] at 1, 17-23.

*(i)    Relevant legal authority*

"Section 2 'covers both concerted and independent action.'" *BRFHH Shreveport, LLC*, 49 F.4th at 528 (quoting *Am. Needle, Inc.*, 560 U.S. at 190).[5] "But

---

[5] It does not appear that Rx Solutions asserts a Section 2 claim for conspiracy to monopolize, but to the extent it does, the Amended Complaint [52] fails to adequately allege such a claim. *See* Am. Compl. [52] at 11-12. "A conspiracy to monopolize can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a

monopolization is harder to establish than the mere restraint of trade that suffices in the Section 1 context." *Id.* "[T]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place." *Id.* at 529 (quoting *Verizon Commc'ns Inc. v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)).

An actual-monopolization claim has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992). "Monopoly power is the power to control prices or exclude competition." *E.I. du Pont de Nemours & Co.*, 351 U.S. at 391. "The existence of such power ordinarily may be inferred from the predominant share of the market." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). The second element, anticompetitive or exclusionary conduct, is "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* at 482-83 (quotation omitted).

---

combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 316 (5th Cir. 2000) (quotation omitted). For the same reasons stated with regard to the Section 1 conspiracy claim, the Amended Complaint [52] contains insufficient allegations from which one could reasonably conclude that Defendants could conspire. *See, e.g., Hood*, 739 F.2d at 1015.

"Attempted monopolization, of course, is similar but allows for liability even if the monopoly never came to fruition." *BRFHH Shreveport, LLC*, 49 F.4th at 528. "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in the particular market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "[A] defendant must have some legally significant share of the market before he approaches the level of dangerous probability of success condemned by the attempt provision of section two." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984).

(ii)    *Whether the Amended Complaint [52] states an actual-monopolization claim*

To the extent Rx Solutions advances an actual-monopolization claim, the Amended Complaint [52] does not plausibly allege Defendants' possession of monopoly power. *See* Am. Compl. [52]. Plaintiff claims that Defendants maintain a limited network of retail pharmacies, which "enhances Defendants' bargaining power and strengthens their monopoly position," and that "Defendants' strategies have resulted in an improper increase of market power and reduced competition, which allows them to improperly dominate the prescription medication market." *Id.* at 8. "As a result of Defendants' improper conduct, it is believed Defendants' market share of the prescription medication market in the State of Mississippi, including but not limited to the Greene County, Mississippi and Stone County, Mississippi, markets, has improperly increased from 17% to over 46%." *Id.* at 9.

23

A court may infer monopoly power under Section 2 from allegations that a defendant holds a "predominant share" of the relevant market. *Grinnell*, 384 U.S. at 571. But even accepting the allegations of the Amended Complaint [52] as true, that Defendants' share of the prescription market increased to "over 46%," Am. Compl. [52] at 9, this is not sufficient to show they have a "predominant share" of the market, *Grinnell*, 384 U.S. at 571. A market share of less than 50% is insufficient to establish such a claim. *See Domed Stadium Hotel, Inc.*, 732 F.2d at 490; *see also In re: Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 382 (E.D. La. 2013) (collecting cases).

Based upon Plaintiff's own allegations, there is no indication that Defendants hold a predominant share of the relevant market, *see Domed Stadium Hotel, Inc.*, 732 F.2d at 490, and any Section 2 actual-monopolization claim necessarily fails, *see BRFHH Shreveport, LLC*, 49 F.4th at 528.

*(iii)    Whether the Amended Complaint [52] states an attempted-monopolization claim*

The required market share for an attempted-monopolization claim is not as high as that needed for an actual-monopolization claim. *See Domed Stadium Hotel, Inc.*, 732 F.2d at 490. The Fifth Circuit has noted that, "[w]hile we must be particularly wary of the numbers game of market percentage when considering an attempt to monopolize suit, a defendant must have some legally significant share of the market before he approaches the level of dangerous probability of success condemned by the attempt provision of section two." *Id.* (quotations and citations omitted). "[A] share of less than the fifty percent generally required for actual

24

monopolization may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present." *Id.*

Although the Amended Complaint [52] avers that Defendants' share of the prescription market has increased to "over 46%," Am. Compl. [52] at 9, it does not allege that any of the other factors are present from which a reasonable person could find a "dangerous probability" of achieving monopoly power in the relevant market, *see Spectrum Sports, Inc.*, 506 U.S. at 456. For example, there are no facts asserted regarding "concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present," which the Fifth Circuit has said "may support a claim for attempted monopolization" where a defendant's market share is less than 50%. *Domed Stadium Hotel, Inc.*, 732 F.2d at 490. This is insufficient to state a plausible claim for attempted monopolization. *See id.*; Am. Compl. [52].

Rx Solutions' Section 1 and Section 2 Sherman Act claims should be dismissed in light of the foregoing deficiencies. And there is nothing in the Amended Complaint [52] or Rx Solutions' arguments in response to Defendants' Motion [53] to indicate that Rx Solutions could amend its pleadings again to allege sufficient facts to state a Sherman Act claim.

2.    Whether the Court should grant leave to amend

Federal Rule of Civil Procedure 15(a)(1) permits a party to amend its pleading once as a matter of course under certain circumstances. *See* Fed. R. Civ. P.

15(a)(1).  "All other amendments require leave of court, although the court should

'freely give leave when justice so requires.'"  *Butler v. Porter*, 999 F.3d 287, 298 (5th

Cir. 2021), *cert. denied*, 142 S. Ct. 766 (2022), *reh'g denied*, 142 S. Ct. 1224 (2022)

(quoting Fed. R. Civ. P. 15(a)(2)).

Although "Rule 15(a) evinces a bias in favor of granting leave to amend, [a]

movant is required to give the court some notice of the nature of his or her proposed

amendments."  *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016)

(quotations omitted).  To take advantage of the liberal rules governing amendment,

"the party requesting amendment, even absent a formal motion, need only set forth

with particularity the grounds for the amendment and the relief sought."  *Id.*

(quotations omitted).  But a district court does not abuse its discretion when,

"almost as an afterthought, the plaintiffs tack[ ] on a general curative amendment

request to the end of their response in opposition to the defendants' motion to

dismiss," even though "[t]he plaintiffs [are] certainly aware of the defendants'

objections to 'their complaint as written (because the objections appeared in the

defendants' principal motion)."  *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th

Cir. 2003).  With such awareness, a plaintiff must either demonstrate how it would

replead the problem issue more specifically if given the opportunity, proffer a

proposed amended complaint, or at least suggest in the responsive pleading any

additional facts not initially pled that could, if pled, cure the pleading defects raised

by the defendants.  *See id.* at 254-55.

The Court previously granted Rx Solutions leave to file its Amended
Complaint [52].  But in the face of Defendants' current Motion [53] to Dismiss, Rx
Solutions has not filed another motion to amend, nor has it requested an
amendment in its Response [57] in opposition to the Motion [53].  *See* Resp. [57].
Instead, Rx Solutions stands by its Amended Complaint [52].  *See id.*  Rx Solutions
has not requested leave to amend or supplied a proposed amended pleading or any
additional factual allegations to support its claims.  *See* Resp. [57].  Indeed, Rx
Solutions' Response [57] does not suggest any additional facts that would cure the
deficiencies raised by Defendants as to the federal claims, *see Goldstein*, 340 F.3d at
254, nor does it contain sufficient factual detail to show that Rx Solutions could
state any additional plausible claims for relief, *see id.*; *Nix v. Major League
Baseball*, 62 F.4th 920, 936 (5th Cir. 2023), *cert. denied sub nom. NIX, NEIMAN v.
MLB*, No. 22-7810, 2023 WL 6378365 (U.S. Oct. 2, 2023).

Rx Solutions has had a fair opportunity to make its case and cure the defects
the Court addressed in its earlier Order [23], and it has now chosen to stand by the
Amended Complaint [52].  As such, further amendment would be a waste of judicial
resources and would be prejudicial to Defendants.  Given the foregoing, the Court
need not grant Rx Solutions further leave to amend.  *See, e.g.,* Fed. R. Civ. P.
15(a)(2); *Goldstein*, 340 F.3d at 254; *First v. Rolling Plains Implement Co., Inc.*, 108
F.4th 262, 272 (5th Cir. 2024) (affirming dismissal of fraud claims with prejudice
instead of permitting amendment when the plaintiff stood by his pleading and did
not seek leave to amend his complaint).

27

B.    Whether the Court should exercise supplemental jurisdiction over Plaintiff's state-law claims

The Amended Complaint [52] invokes the Court's federal question jurisdiction under 28 U.S.C. § 1331.[6]  *See* Am. Compl. [52] at 2.  Upon dismissal of Plaintiff's Sherman Act claims, only its state-law claims remain.  *See id.*  The Court may exercise supplemental jurisdiction over Plaintiff's remaining state-law claims, *see* 28 U.S.C. § 1367(a), but it also has the discretion to decline to exercise supplemental jurisdiction over those claims, *see* 28 U.S.C. § 1367(c)(3).

"District courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over a state claim once all federal claims are dismissed." *Heggemeier v. Caldwell Cnty.*, 826 F.3d 861, 872 (5th Cir. 2016) (quotation omitted). The Court must consider "common law factors of judicial economy, convenience, fairness, and comity."  *Id.* (quotation omitted).  The Fifth Circuit has "elucidated the general rule that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial."  *Id.* (quotation omitted).

─────────────────

[6]  The original and Amended Complaints [1], [52] also cited 28 U.S.C. § 1332, but the pleadings contain no allegations to support such jurisdiction.  *See* Compl. [1] at 2; Am. Compl. [52] at 2.  Neither pleading states the parties' citizenship, nor do they even allege that complete diversity of citizenship exists, *see* Compl. [1]; Am. Compl. [52], which would be necessary to invoke diversity jurisdiction, *see* 28 U.S.C. § 1332(a); *see also, e.g., Mullins v. Testamerica Inc.*, 300 F. App'x 259 (5th Cir. 2008) (noting that the Fifth Circuit "adhere[s] strictly to the rule that citizenship of the parties must be distinctly and affirmatively alleged," and that "[f]ailure adequately to allege the basis for diversity jurisdiction mandates dismissal" (quotations omitted)); *Illinois Cent. Gulf R. Co. v. Pargas, Inc.*, 706 F.2d 633, 636 (5th Cir. 1983) ("[T]he basis upon which jurisdiction depends must be alleged affirmatively and distinctly and cannot be established argumentatively or by mere inference." (quotations omitted)).

The dismissal of Plaintiff's federal claims comes at the pleading stage, and any trial on the state-law claims is a "distant possibility—months, if not years away—if it would happen at all," which weighs in favor of declining supplemental jurisdiction. *Manyweather v. Woodlawn Manor, Inc.*, 40 F.4th 237, 246 (5th Cir. 2022). Defendants have not yet answered the Amended Complaint [52]. And although a Case Management Order [34] was entered prior to the filing of the Amended Complaint [52], the attorney conference, disclosure requirements, and discovery were all stayed pending a ruling on the present Motion [53] to Dismiss. *See* Order [56] at 1. Thus, the common-law factors weigh in favor of declining supplemental jurisdiction. *See Manyweather*, 40 F.4th at 246; *Heggemeier*, 826 F.3d at 872.

### III.  CONCLUSION

To the extent the Court has not specifically addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result. Defendants' Motion [53] to Dismiss should be granted in part and denied in part, and the Court will decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, the Motion [53] to Dismiss under Federal Rule of Civil Procedure 12(b)(6) filed by Defendants Caremark, L.L.C., and CVS Pharmacy, Inc., is **GRANTED IN PART**, as to Plaintiff Rx Solutions, Inc.'s claims under the Sherman Act, and **DENIED IN PART WITHOUT PREJUDICE**, as to Plaintiff Rx Solutions, Inc.'s state-law claims.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiff Rx Solutions, Inc.'s claims against Defendants Caremark, L.L.C. and CVS Pharmacy, Inc., under the Sherman Act are **DISMISSED WITH PREJUDICE**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the Court **DECLINES** to exercise supplemental jurisdiction over Plaintiff Rx Solutions, Inc.'s state-law claims under 28 U.S.C. § 1367(c)(3), and Plaintiff Rx Solutions, Inc.'s state-law claims are **DISMISSED WITHOUT PREJUDICE**.  The Court will enter a separate Final Judgment in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED**, this the 31st day of January, 2025.

_s/ Halil Suleyman Ozerden_
HALIL SULEYMAN OZERDEN
CHIEF UNITED STATES DISTRICT JUDGE